**UNITED STATE DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DONALD W. HUEBNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 06-CV-05857 |
| v. ) | |
| ) | The Hon. Michael T. Mason |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff Donald W. Huebner ("Huebner" or "claimant") filed a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits and finding that claimant was not disabled prior to December 31, 1983, his date last insured. 42 U.S.C. §§ 416(i) and 423(d). The Commissioner opposes Huebner's motion and has asked this Court to affirm the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is denied and the denial of his claim for disability insurance benefits is upheld.

**I.     BACKGROUND**

Huebner filed his first application for disability insurance benefits on September

1

24, 1986, alleging a primary disability of multiple sclerosis ("MS").  (R. 23).[1]  The

Commissioner denied that application on February 3, 1987.  (*Id*.).  Huebner filed a

second application on October 30, 1987, which was denied due to insufficient evidence.

(R. 23-24).  Claimant filed his third application on September 28, 1988.  (R. 24).  The

Commissioner granted that application and awarded Huebner Supplemental Security

Income ("SSI") with a disability onset date of September 1, 1988.  (R. 24).  Consistent

with that decision, claimant received SSI until November 2000, whereupon at age 62,

claimant became entitled to retirement insurance benefits in an amount that made him

ineligible to receive disability insurance benefits.  (*Id*.).

On January 6, 1993, while receiving SSI benefits, claimant filed his fourth

application for disability insurance benefits.  (R. 24).  That claim was denied based on a

finding that claimant had not established that he was disabled prior to December 31,

1983, his date last insured.  (*Id*.).  Huebner filed the present application, his fifth, on

December 13, 2000, alleging that he has been disabled due to MS since July 1, 1981.

(R. 36-38).  The Commissioner denied this claim on December 18, 2000 and again on

reconsideration on January 12, 2001.  (R. 32-35, 40-44).  Claimant then filed a request

for a hearing.  (R. 45).  Administrative Law Judge Cynthia Bretthauer ("ALJ Bretthauer")

denied this request on April 17, 2001.  (R. 155-58).  ALJ Bretthauer found that

Huebner's claim involved the same facts and/or issue as the final determination dated

September 15, 1993.  (R. 158).  Relying on the doctrine of *res judicata*, ALJ Bretthauer

[1]As discussed below, the complete claim files related to Huebner's prior applications are
not available.  Accordingly, unless otherwise stated, the facts related to claimant's first four
applications are based on the statements set forth in the ALJ's opinion.  (R. 23-31).

found that the prior final and binding determination, coupled with the absence of new evidence, precluded Huebner's claim. (*Id.*).

Claimant subsequently filed a request for review. (R. 159). On February 5, 2002, the Appeals Council remanded the case back to ALJ Bretthauer. (R. 160-62). In that order, the Appeals Council noted that Huebner did, in fact, submit additional medical evidence in connection with his most recent request for benefits. (R. 161). The council also observed that Huebner's current claim file "is not accompanied by the claim file related to the prior determination/decision." (R. 161). The Appeals Council instructed the ALJ, on remand, to "attempt to obtain the prior claim file to determine if *res judicata* is applicable," and, if the prior claim file could not be located, to consider the merits of the request. (R. 161-62).

As instructed by the Appeals Council, ALJ Bretthauer attempted to locate any prior claim files. (R. 165-66). In a decision issued on March 21, 2003, the ALJ noted that "[b]ased on the investigations of this office, it appears that all prior disability files have been destroyed in accordance with the file retention regulations." (R. 166). However, ALJ Bretthauer deemed the inability to locate the prior file "immaterial" because "claimant has no statutory authority to reopen a determination rendered more than four years ago." (*Id.*). ALJ Bretthauer noted that pursuant to 20 CFR §§ 404.987-89, a decision may be reopened within four years if there is "good cause" to do so. (R. 165-66). Huebner filed his current application in December 2000. (R. 166). Therefore, even assuming *arguendo* that good cause existed, ALJ Bretthauer found that the three determinations made in 1987 and 1988 took place more than twelve years prior which is "considerably more than the four years allowed to reopen such initial determinations."

(*Id.*).  Finding no justification to reopen the prior decisions, ALJ Bretthauer dismissed Huebner's claim on grounds of finality.  (*Id.*).

Huebner again requested a review of ALJ Bretthauer's decision.  (R. 167).  On August 6, 2004, the Appeals Council determined that ALJ Bretthauer's dismissal was "inappropriate" because several prior folders were unavailable and it was not possible to determine if *res judicata* applied.  (R. 240-42).  The Appeals Council remanded the matter to a different ALJ for a hearing on the issue of disability from Huebner's alleged onset date of July 1, 1981 through and including December 31, 1983.  (R. 242).

On April 20, 2005, claimant appeared before ALJ Alan Jonas ("ALJ Jonas") for a hearing on his claim for disability insurance benefits.  (R. 463-75).  After brief oral arguments from the attorneys and limited testimony by claimant, the ALJ ordered claimant's attorney to prepare appropriate interrogatories to submit to a medical expert.  (R. 470-72).  He also granted claimant time to locate his former care giver, Isaac Achinavou ("Achinavou"), and adjourned the proceeding in order to allow claimant to submit additional evidence.  (R. 473).  ALJ Jonas presided over a continued hearing on August 23, 2005.  (R. 476-512).

ALJ Jonas issued a decision denying Huebner's claim for benefits on November 22, 2005.  (R. 23-31).  In that decision, ALJ Jonas determined that Huebner had not shown that he lacked the capacity to timely exercise his appeal rights, or that mitigating factors warranted reopening under the narrow grounds specified 20 U.S.C. §404.988(c).  (R. 24-25).  The Appeals Council subsequently denied claimant's request for review and ALJ Jonas' decision became the final decision of the Commissioner.  *Nelms v. Astrue*, 553 F. 3d 1093, 1097 (7th Cir. 2009).

4

## II.    FACTUAL BACKGROUND

### A.    Claimant's Testimony

Claimant testified at the August 23, 2005 hearing.  (R. 488-507).  Huebner recalled that he first began to notice symptoms in the late 1970's and early 1980's that eventually manifested into MS.  (R. 488-90).  He stated that he "must have went to 12 doctors" before being diagnosed with MS.  (R. 495).  According to Huebner, the first physician from whom he sought treatment was Dr. Theodore Fox, the team physician of the Chicago Blackhawks, in 1977.  (*Id.*).  Claimant received a "shot" from Dr. Fox because his "leg was not feeling right."  (*Id.*).  Claimant also recalled receiving treatment from a Dr. Richter.  (R. 496).

Claimant stated that "the first time that [he] was hospitalized with the disease" was at St. Francis Hospital "in '78, '79" for "a week or two."  (R. 489).  Huebner testified that the doctors at St. Francis were unable to correctly diagnose him and "were coming up with all sorts of crazy things."  (*Id.*).  They diagnosed "peripheral neuritis and others, and never once saying that [he] had multiple sclerosis."  (*Id.*).  Huebner testified that at the time, the doctors thought his condition to be a "virus" and stated "it'll go away."  (*Id.*).  He also testified that he went to twelve doctors before "Dr. Bosh[e]s" finally diagnosed him with MS.  (R. 495).

Claimant recalled receiving treatment at Weiss Hospital "in the '80's."  (R. 488).  Claimant's stay at Weiss Hospital lasted for "about a week or two."  (R. 489).  He was seen by Dr. Sheldon Lazar ("Dr. Lazar") and "given ACTH, at that time, that's the only thing that was available . . . for multiple sclerosis."  (R. 487-89).  Claimant also received treatment at Columbus Hospital "somewhere . . . in the '80's."  (R. 490).  Claimant

stated he was hospitalized at a third unknown hospital "in the 80's." (R. 488).

During his hospitalizations, claimant "couldn't lift, [he] couldn't walk, [he] couldn't function properly . . . the message wouldn't get there, from [his] brain down to the extremities." (*Id.*). According to claimant, his condition "starts in the extremities. Fingers, legs, [his] whole left side is affected." (*Id.*). He has experienced numbness and stiffness in his fingers since the late 1970's and early 1980's. (*Id.*). Huebner stated that the numbness in his fingers was such that "[he] can't put [his] hand in [his] pocket and determine whether [he's] feeling a dime, a nickel or a quarter." (*Id.*). Claimant declared that he's "always had the numbness in [his] fingers. More so in the left than in the right." (R. 491). During the late 1970's to early 1980's, claimant experienced "tremors, numbness, atrophy," loss of balance and blurred vision. (R. 491-93). Claimant recalled one instance where his blurred vision required him to "ski with one eye covered." (R. 491).

Huebner attended two years of college and two years of design school. (R. 506). He worked as an interior designer and had his own business until 1979. (R. 492). Huebner testified that his physicians told him to "go ahead and work, as long as you feel that you can do that." (R. 493). Claimant's job as an interior designer "required a tremendous amount of leg work, walking the Merchandise Mart . . . up and down floors . . . up and down the hallways with clients." (R. 492-93). Claimant testified that his condition had progressed to such an extent that it required him to cease working in 1979. (R. 492).

Huebner stated that his condition was "not as severe" before being diagnosed with MS in 1979. (R. 495). Claimant started using a cane to assist in walking "in the

6

late, late '80's."  (R. 494).  Prior to that, he was able to get around by leaning onto walls or furniture to keep his balance.  (*Id.*).  Huebner stated that "[i]n the early '80's, '79, '80 . . . [he] was able to walk, but . . .  always had to use [his] hands . . . to lean on something."  (*Id.*).  Huebner also recalled that his "balance started getting worse" "in the late '80's."  (*Id.*).  He began to use a walker on a regular basis "in the late 80's."  (R. 502-03).  Thereafter, he "graduated to a cane," then " went back to the walker," and then got "an Amigo, a little electric cart."  (R. 503).

Prior to his disability Huebner was a "very avid skier" and "enjoyed the sport immensely."  (R. 491, 502).  Claimant first started noticing "things that [he] couldn't do that [he] used to be able to do in skiing" in the "late '70's, early '80's."  (R. 491).  For example, claimant had difficulty skiing moguls and preventing falls.  (R. 492).  Claimant testified that he continued to ski until 1983 or 1984, but experienced an increased number of falls and was afraid that if he continued to ski he would seriously injure himself.  (R. 502-04).  Huebner also testified that between 1979 and 1983 his MS prevented him from riding a bike and water-skiing.  (R. 497).

At the time claimant quit working, he was able to fix his own meals and care for himself "to a degree."  (R. 493).  In the late '70's, claimant's mother began spending her summers with him.  (R. 499).  During this time, Huebner's mother would do the grocery shopping, cooking and laundry.  (*Id.*).  Claimant's mother continued to spend her summers with him until her death in October 2004.  (*Id.*).

Huebner testified that his condition progressed to such an extent in the late '80's that he was unable to care for himself and had to seek a home aide.  (R. 497-98).  According to claimant, the Illinois Department of Rehabilitation Services ("DRS")

provided him with a home aid to assist with his household chores.  (R. 498).   DRS assigned two aides in the "late '80's" but, according to claimant, "they weren't helpful at all" to him.  (R. 498).  In 1990, Isaac Achinavou ("Achinavou") began assisting claimant with his household duties.  (R. 497).

### B.    The Achinavou Affidavit

Huebner also submitted an affidavit executed by Achinavou on August 22, 2005. (R. 432-36).  In that affidavit, Achinavou stated that he was claimant's home care aid from October 1990 until some time in 1998.  (R. 432).  Achinavou was aware claimant had two prior home care aides, but he was "not aware of how long a period of time these individual home care aides were employed to care for Mr. Huebner."  (*Id.*).

According to the Achinavou, claimant lived alone in the fall of 1990.  (R. 432). Achinavou was hired to care for claimant three days per week for four hours per day. (*Id.*).  "Some time in 1992" he moved into claimant's apartment to provide full-time care. (*Id.*).  Although Achinavou provided full-time care, he was only paid for three days per week/four hours per day.  (*Id.*).

Achinavou described Huebner as "extremely weak physically" and stated that claimant "could not do much if any physical activities at all during the entire time that [Achinavou] cared for him."  (R. 433).  Achinavou recalled that claimant's "physical activities were severely restricted by the constant physical pain, numbness, and stiffness . . ."  (*Id.*).  He averred that "on an average of every two to three weeks, Mr. Huebner would be confined to his bed for two to three days because he physically could not get out of bed at all due to his pain, stiffness and numbness."  (*Id.*).   According to Achinavou, "there were times when Mr. Huebner could not bend his knees at all; [t]here

were also times when Mr. Huebner could not feel his fingers at all." (R. 434). He further averred that claimant "experienced almost chronic shaking, shivering, or trembling . . . particularly whenever he attempted to walk as well as when he attempted to prepare a meal and/or eat." (R. 433). These shaking attacks would last up to five days. (R. 434). Achinavou stated claimant's "physical restrictions also made it difficult for him to enter and exit an automobile." (*Id.*). Because claimant "was not able to perform most activities of daily living," Achinavou "performed all of the grocery shopping, laundry, meal preparation." (*Id.*).

### C. Medical Evidence

The Commissioner previously found claimant disabled as of September 1, 1988. (R. 24). The claim file associated with that prior benefits determination and the claim files associated with Huebner's unsuccessful requests for benefits were subsequently lost and/or destroyed. (R. 199). Nevertheless, the administrative record contains certain exhibits admitted in connection with the prior determinations including various medical records. (R. 46-48, 55-154). It also includes two letters from Huebner's treating physicians prepared in connection with Huebner's current application. (R. 148, 151).

Irving Garlovsky ("Dr. Garlovsky") completed a residual capacity examination report and service plan on or around October 4, 1990. (R. 46-47). Dr. Garlovsky noted claimant's diagnosis of MS with muscle and bladder involvement, "onset years ago." (R. 46). He concluded that claimant could not perform the type of work that would require standing, walking, or carrying light to occasional heavier weight. (*Id.*). Dr. Garlovsky opined that Huebner needed help with bathing, dressing, housekeeping,

transportation and meal preparation.  (*Id.*).  Consistent with this observation, the doctor recommended that the DRS assign a home aid for four hours a day, three days a week.  (R. 47).

The record also includes a residual functional capacity ("RFC") examination report completed by  Michael Preodor, M.D. ("Dr. Preodor").  (R. 129-30).  In that report, Dr. Preodor noted that he last examined the claimant in 1993.  (R. 130).  The doctor identified Huebner's current diagnosis as MS with an onset date of "x10 yrs."  (R. 129).  Dr. Preodor classified claimant's rehabilitation potential as "fair."  (*Id.*).  A second RFC examination report, also completed by Dr. Preodor and dated March 6, 1996, again indicates that claimant suffers from MS with an onset date of greater than ten years and has a fair rehabilitation potential.  (R. 134-35).  On November 15, 2000, Dr. Preodor completed another RFC examination report and identified claimant's diagnosis as MS "for 20 years."  (R. 137).  The record also includes two physician's certification forms completed by Dr. Preodor at the request of the DRS that indicate claimant is "appropriate" for a home service program.  (R. 131-32)

Huebner also submitted a discharge summary from Rush-Presbyterian / St. Luke's Medical Center dated July 3, 1993.  (R. 358-59).  That document indicates that plaintiff was admitted to the hospital on June 28, 1993 for acute exacerbation of MS.  (R. 358).  J. Jensen, M.D. ("Dr. Jensen") noted that claimant was then a 54 year-old male with a 20 year history of MS.  (*Id.*).  In connection with his treatment of claimant, Dr. Jensen observed that claimant "started using a walker in 11-92 and now can hardly walk with a walker."  (*Id.*).

In addition to the aforementioned records, Huebner also submitted a letter from

Louis D. Boshes, M.D. ("Dr. Boshes") dated May 8, 2001. (R. 148). That letter states as follows:

> I am a neurologist who first saw [claimant] in 1979, took a history of, and then made a complete neurological examination. I made the diagnosis of MULTIPLE SCLEROSIS.
>
> I continued to see Mr. Huebner on regular intervals and gave him symptimatic [sic] and supportive care until the Fall of 1987 at which time I retired from active practice.

(*Id.*). Huebner also submitted a May 25, 2001 letter from Dr. Preodor. (R. 151). In that letter, Dr. Preodor states that he has treated claimant for 15 years. (*Id.*). According to Dr. Preodor, claimant "suffers from Multiple Sclerosis and is unable to perform self care without assistance." (*Id.*). Dr. Preodor opined that Huebner's condition has "gradually deteriorated over the years," and his prognosis is "guarded." (R. 196).

### D.    Medical Expert's Testimony

 At the August 23, 2005 hearing, Dr. Roland A. Manfredi ("ME Manfredi"), a Board-certified neurologist and neurosurgeon, testified as the medical expert. (R. 483-88). In preparation for his testimony, ME Manfredi reviewed Huebner's available medical history and found it to be adequate for providing testimony. (R. 484).

ME Manfredi stated that he is familiar with MS and its effects, including the "periods of attacks and worsening and betterment, preceding the development of ataxia and paraplegia." (R. 487). ME Manfredi agreed with Dr. Boshes' diagnosis of MS dating back to 1979. (R. 485). He acknowledged that an individual may suffer from MS and still be able to work. (*Id.*). Because the available records "only go back to 1993" ME Manfredi could not determine what effect, if any, MS had on claimant's ability to function prior to that date. (*Id.*). He noted that Rush Presbyterian / St. Luke's

neurology service confirmed that claimant had MS and related limitations sufficient to "consider him disabled from employability as of 1993." (R. 486). However, the ME could not find "records before that time that [provide] a description of the illness as it's manifest in [claimant]" and was therefore "a little reluctant to make any guesses." (*Id.*).

When pressed to consider claimant's records from his 1993 hospitalization, ME Manfredi noted that claimant's "illness certainly antedates 1992," but could not pinpoint "how far back it goes." (R. 487). He also observed "some evidence of impairment neurologically back into the late '80's." (*Id.*). Specifically, ME Manfredi noted a worsening paraphrasis and ataxia which began in 1992. (*Id.*). Based on his knowledge of MS and the related "periods of attacks and worsening and betterment, preceding that development of the ataxia and paraplegia," the ME elected to "go back a few years, prior to that date as the onset of [claimant's] difficulty with his illness, and as far as his ability to function." (*Id.*). He opined that any determination that the onset of claimant's disability occurred in 1983 "would be stretching it a bit, although its quite possible." (R. 487). When asked, ME Manfredi concluded that he could not state with reasonable medical certainty that the onset of claimant's MS was in or prior to 1983. (R. 488). Finally, ME Manfredi also observed that "doctors are obligated to keep records . . . for at least seven years." (R. 510).

### E. Vocational Expert's Testimony

Lee O. Knutson ("VE Knutson") testified as the vocational expert at the August 23, 2005 hearing. (R. 505-10). VE Knutson had reviewed the documents in Huebner's file and noted claimant's most recent past relevant work as an interior designer in 1979. (R. 505). The VE stated that the present-day job requirements for an interior designer

are "probably essentially the same" as they were in 1979. (*Id.*). VE Knutson classified an interior designer's job as "skilled, probably light to medium in physical demand." (R. 506). He noted that the required skills included "a knowledge of color combinations . . . interior design materials, paints, [and] wallpapers." (*Id.*). Although the physical demands of the job would normally be light, the VE observed that "there could be times when [someone] might lift something heavier than that." (*Id.*). VE Knutson could not "think of any specific job that would transfer. . . to sedentary work." (*Id.*)

ALJ Jonas presented VE Knutson with the following hypothetical individual: a 50-year-old male high school graduate with several years of college, whose past work was as an interior designer, which is classified as light to medium, and skilled, although none of the skills are transferable to sedentary work. (R. 506). The hypothetical individual could use his dominant hand and arm for fine work, and his non-dominant, arm and hand for gross manipulation. (*Id.*). VE Knutson determined there are jobs in the national economy that the hypothetical individual could perform. (R. 507). He testified that, within the nine-county Chicago metropolitan area, the hypothetical individual could perform the job requirements of an informational clerk (6,000 available positions), surveillance system monitor (1,500 positions), and sedentary clerical and cashier positions (8,000 positions). (*Id*). The ALJ then asked VE Knutson to assume that the same hypothetical individual experienced regular periods of numbness and stiffness in his hands and fingers. (R. 507). VE Knutson opined that "the sedentary clerical and cashier positions" would no longer be available. (*Id.*). However, even with some "numbness and stiffness" the hypothetical individual could still do some "occasional handwriting," and therefore the positions of surveillance system monitor and information

clerk would still be available.  (*Id.*).  Claimant's attorney asked VE Knutson to assume

the same limitations as previously stated, but that the hypothetical individual would miss

work for one to five days in a week as frequently as once a month.  (R. 507-08).  VE

Knutson concluded that the hypothetical individual would not be employable.  (R. 508).

He opined that it would be "very difficult" for an individual who is absent or tardy more

than ten percent of time or more than twice a month to maintain employment in an

unskilled job.  (R. 508).

## III.    LEGAL ANALYSIS

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial

evidence and free from legal error.  42 U.S.C. 405(g)*; Steele v. Barnhart,* 290 F.3d 936,

940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and is

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v.*

*Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971)).  We must consider the entire

administrative record, but will not "reweigh evidence, resolve conflicts, decide questions

of credibility, or substitute our own judgment for that of the Commissioner."  *Lopez v.*

*Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel,* 227 F.3d 863, 869

(7th Cir. 2000)).  Rather, this Court must  "conduct a critical review of the evidence" and

not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate

discussion of the issues."  *Id.*

While the ALJ "must build an accurate and logical bridge from the evidence to his

conclusion," he need not discuss every piece of evidence in the record.  *Dixon v.*

*Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*) (*quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

## B.     Analysis Under the Social Security Act

In order to receive disability insurance benefits, a claimant must establish that he is disabled under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id* at 886.

The ALJ followed this five-step analysis. At step one, ALJ Jonas found that Huebner was not engaged in substantial gainful activity, and was not engaged in any

15

substantial gainful activity at the time he last met the disability insured status requirements on December 31, 1983. (R. 26-27, 30). The ALJ noted Huebner's earnings of $24,457 in 1980 and $6,479 in 1981, but reserved ruling on that employment. (R. 30). At step two, ALJ Jonas found that claimant's condition was severe throughout 1983. (R. 30). ALJ Jonas then determined, at step three, that Huebner's condition did not meet or equal any listed impairment in 1983, or at any time prior to September 1, 1988. (R. 28, 31). Next, ALJ Jonas found that in 1983 Huebner had the RFC for all work activity except more than occasional standing and walking, and lifting and carrying light and heavy weight. (*Id.*). He also found that claimant's testimony, "although credible, did not advance his claim." (R. 29). At step four, ALJ Jonas determined that claimant was unable to perform his past relevant work in 1983. (R. 31). However, at step five, ALJ Jonas determined that there were a significant number of jobs in the national economy that the claimant could have performed in 1983, and therefore he was not disabled under the Act. (*Id.*).

Huebner challenges ALJ Jonas' determination that he was not entitled to disability benefits as of December 31, 1983. (*Id.*). Specifically, Huebner contends that the ALJ ignored substantial evidence demonstrating that the onset of his disability was prior to December 31, 1983, including unspecified evidence of an onset of symptoms in 1977[2]. Claimant also argues that the ALJ failed to recognize his last date of employment, 1979, as the onset date of his disability. Therefore, Huebner asserts that the ALJ's step five

---

[2]In his application for disability insurance benefits, Huebner states that he became unable to work because of a disabling condition on July 1, 1981. (R. 36). However, in his memorandum in support of the motion for summary judgment [30], claimant argues that he was disabled as of 1977.

determination is also erroneous.  In the alternative, claimant argues that the Appeals

Council erred by not granting his request for review because of the destruction of

important documents.  We begin with claimant's arguments regarding ALJ Jonas'

determination of the onset of his disabling condition.

## IV.    SUBSTANTIAL EVIDENCE SUPPORTS ALJ JONAS' DECISION

Claimant contends, without citing to supporting authority, that "[p]articulary in the

case of slowly progressive impairments, it is not necessary for an impairment to have

reached Listing-level severity (*i.e.* be decided on medical grounds alone) before 'onset'

can be established."  In the alternative, claimant argues that "[g]iven the consistency of

the information contained in this record, it would be reasonable to infer" an onset date

prior to  December 31, 1983, the expiration of his date last insured.  Relying on Social

Security Ruling ("S.S.R.") 83-20, Huebner argues that the relevant factors for the

determination of the "onset" date of a disability are: (1) the claimant's allegation of the

"onset date"; (2) the date the claimant left work; and (3) the medical evidence of onset.

Claimant contends that each of these factors requires an onset date of 1977 or,

alternatively, prior to 1981.

"It is axiomatic that the claimant bears the burden of supplying adequate records

and evidence to prove [a] claim of disability."  *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th

Cir. 2004); *see also Briscoe v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (noting that

S.S.R. 83-20 "does not free the claimant from her burden to prove disability within the

meaning of the Act."); *Henderson v. Apfel,* 179 F.3d 507, 513 (7th Cir. 1999) ("Medical

evidence is the most important factor [in determining the onset date of a disability] and

the chosen onset date must be consistent with it.").  To support his alleged onset date,

Huebner relies on the following medical evidence: (1) ME Manfredi's opinion that claimant's symptoms "certainly ante-dates 1992," (2) numerous diagnosis of MS prior to 1983; (3) the letters from his treating physicians; (4) his hospitalizations in 1993; and (5) his need for assistance, initially during the summer from his mother and later through a full-time home aide.

ALJ Jonas recognized claimant's diagnosis of MS prior to 1983 and credited ME Manfredi's opinion that "claimant has had multiple sclerosis since at least 1979." (R. 27). However, ME Manfredi could not state with reasonable medical certainty that the onset of claimant's disability preceded December 31, 1983. (R. 486-88, 29). Accordingly, the ALJ did not err in concluding that claimant's diagnosis did not independently establish disability. *See Dixon*, 270 F.3d at 1177 (affirming grant of summary judgment in favor of Commissioner where ALJ elected to give treating physician's opinion little weight because it was not supported by medical findings); *Briscoe*, 425 F.3d at 356 (requiring evidence to "indicate that the disease had progressed so far so as to prevent [claimant] from engaging in any substantial gainful activity.").

Claimant asserts that the ALJ erred by failing to credit Dr. Boshes' May 8, 2001 letter and Dr. Preodor's May 25, 2001 letter. We disagree. "A retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period." *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). While this evidence is usually in the form of contemporaneous medical records, lay evidence relating back to the claimed period of disability can also support a finding of past impairment. *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006). In his letter, Dr. Boshes states that he diagnosed Huebner with MS in 1979. ALJ Jonas recognized Dr. Boshes as a "medical

source with contemporaneous knowledge about the claimant's condition during the critical time in 1983." (R. 28). However, he also noted that Dr. Boshes reported only that claimant was seen on "regular intervals" and was "symptomatic (sic)," and did not explain Huebner's limitations at the time of his diagnosis, in 1979. (*Id.*). Given the absence of corroborating information, we cannot find that the ALJ erred in giving little weight to Dr. Boshes' conclusion. *See Gildon v. Astrue*, 260 Fed. Appx. 927, 929 (7th Cir. 2008) (holding that a claimant "is not entitled to disability benefits simply because [his] physician states [he] is disabled."); *Butera v. Apfel*, 173 F.3d 1049, 1056 (7th Cir. 1999) (describing potential for treating physician bias in statements solicited by patients).

For this same reason, we are not persuaded by claimant's argument that the ALJ did not sufficiently credit Dr. Preodor's May 25, 2001 letter, stating that Huebner "suffers from Multiple Sclerosis," "[h]is condition has gradually deteriorated over the years" and "[h]is prognosis is guarded." (R. 151). ALJ Jonas recognized Dr. Preodor's statements – and his functional assessments dated March 1993, March 6, 1996, and August 8, 2003 – and found that they "were not expressly related back to 1983." (R. 28). Because this is consistent with the medical evidence included in the record, we cannot find that the ALJ's conclusion is in error.

Next, claimant contends that the ALJ did not give sufficient credit to his hospitalizations in 1993. Claimant contends that MS is a progressive impairment and therefore the ALJ should consider the hospitalizations as evidence of his condition in 1983. The Seventh Circuit has recognized that "[w]ith slowly progressing impairments, an onset date for purposes of social security benefits of a disability must often be inferred, especially when adequate medical records are not available." *Pesek v. Apfel,*

2000 U.S. App. LEXIS 8493, *6 (7th Cir. Apr. 26, 2000). However, this principle does not obligate ALJ Jonas to conclude that claimant's onset date occurred almost a decade before it can be established through supporting medical records. As the ALJ recognized, "the earliest documentation of laboratory findings and clinical signs in the present record are from 1993, almost ten years after the claimant's [date last insured]." (R. 28). He further noted that, according to the medical records, when hospitalized in March 1993 claimant "had been ambulatory until four months prior to admission," "had been 'fairly active' until four months earlier and his 'longstanding' symptoms were noted to be only numbness and occasional weakness in [his] . . . left hand and similar symptoms more recently in the right hand." (R. 29). Thus, the ALJ explained why he elected to give claimant's hospitalizations little weight. 20 C.F.R. § 404.1527(d)(2). Similarly, the ALJ noted that claimant required home services in 1990 but found "no evidence that he required these services in 1983." (R. 28).

    As the Seventh Circuit has repeatedly explained, this Court should not "displace the ALJ's judgment by reconsidering facts or evidence." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Rather, we must determine if the ALJ's findings are supported by substantial evidence. *Diaz*, 55 F.3d at 306. If the ALJ's decision is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," it must be affirmed even if an alternative position is also supported by substantial evidence. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009); *see also Schneck v. Barnhart*, 357 F.3d 697, 699 (*citing Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992)). Here, our review of the ALJ Jonas' conclusions are

supported by substantial evidence.  *See Liskowitz v. Astrue*, 559 F.3d 736, 746 (7th Cir.

2009) (affirming ALJ's decision where it is supported by substantial evidence).  As noted

above, the ALJ relied on ME's inability to state with reasonable medical certainty that

claimant's onset date preceded December 31, 1983 or offer an assessment of any

functional loss prior to the late 1980's.  (R. 29).  He also noted that "nothing in the reports

from the two neurologists who were treating the claimant during the early and mid-1980's

. . . even begins to adequately demonstrate that [t]he claimant was more limited than

what has been found [and] . . . [n]either certified that the claimant had a disabling

restrictions at the end of 1983."  (R. 28).  ALJ Jonas also relied on a medical report

stating that claimant did not begin to use a walker until November 1992, almost nine

years after his date last insured, as well as claimant's admission that he continued to ski

until 1983 or 1984.  (R. 29).  *See Byrne v. Board of Educ. Sch. Dist. of Allis-West

Milwaukee*, 979 F. 2d 560, 565 (7th Cir. 1992) (noting that participation in recreational

activities "may be evidence tending to undermine a finding of disability.").  Because ALJ

Jonas sufficiently articulated the evidence supporting his conclusion and that evidence is

adequate to support his finding, his determination must be affirmed.  *See, e.g.* 42 U.S.C.

§405(g); *Steele,* 290 F.3d at 940.

## V.  THE LOSS OR DESTRUCTION OF CLAIMANT'S PRIOR RECORDS DOES NOT MANDATE A FINDING OF DISABILITY

Claimant contends that the Appeals Council committed reversible error by

denying his request for a review of ALJ Jonas' decision.  Claimant argues that the

"spoliation" of his medical records by the Social Security Administration and/or his

treating physicians involves a "broad policy or procedural issue that may affect the public

interest" and mandates reversal of ALJ Jonas' denial of his claim for benefits.  Claimant

further argues that "it would be against equity and good conscious" to deny his request.

There is no evidence that the Commissioner intentionally destroyed evidence in order to inhibit Huebner's ability to prevail in this matter. The relevant regulations provide for reopening of a file, upon certain conditions, within four years at any time in instances of fraud or other limited factors not applicable to the present case. 20 CFR 404.988(c). ALJ Jonas recognized these circumstances and found "nothing in the present record that even implies a possible circumstance that warrants reopening under the narrow grounds specified in regulation 404.988(c)." (R. 24). Although claimant argues that the Administration "had a legal duty not to destroy his SSA claim file," he has not cited any regulation that requires the Social Security Administration to indefinitely retain records, or to retain records more than twelve years after a request for benefits is granted. Claimant also has not shown that his treating physicians committed spoliation, or that there was anything improper in what we presume to be their routine destruction of medical records. Moreover, ME Manfredi testified that doctors are only obligated to keep records for seven years. (R. 510). Based on the facts before this Court, and the absence of supporting authority in claimant's supporting memorandum, we deny Huebner request for a finding that it would be against equity and good conscience to hold him accountable for the absence of medical evidence. *See Eichstadt v. Astrue*, 534 F. 3d 663, 668 (7th Cir. 2008) (It is well settled that a "claimant bears the burden of producing medical evidence that supports [his] claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time.").

Huebner asserts that this Court should order the Commissioner to reopen his file

and, in support, cites *Fowler v. Califano*, 596 F.2d 600 (3rd Cir. 1979). Claimant argues that *Fowler* stands for the proposition that a denial of benefits based on an incomplete record is an "injustice" and therefore it is "unconscionable" for the Commissioner to oppose remand. Claimant's interpretation of *Fowler* is not consistent with the Third Circuit's holding in that case. *Fowler* involved the appeal of a denial of benefits by an individual suffering from MS. 596 F.2d at 601. The Third Circuit noted that the record revealed "overwhelming evidence*"* in support of a finding of disability. *Id.* at 603. That court then elected to consider the effect of a claim filed six years prior – and denied more than twelve months before – claimant filed the benefits application at issue. *Id.* Noting that claimant had produced evidence "sufficient to reconstruct" the file before the Social Security Administration in the prior benefits determination, the Third Circuit remanded the case for a determination of whether to reopen the prior determination. *Id.* at 604.

Unlike the claimant in *Fowler*, Huebner has not presented sufficient evidence to support the finding of a disability. Moreover, as the ALJ noted in his opinion, *Fowler* is also distinguishable because that court found evidence that the prior determination was based on an incorrect calculation of the claimant's last insured status, and therefore reopening was at least potentially justifiable under 20 C.F.R. 404.957(c)(8). (R. 24). Accordingly, and contrary to claimant's characterization of that case, *Fowler* does not require remand. Huebner's request for an order instructing the Commissioner to reopen his file is denied.

## VI.  CONCLUSION

For the reasons above, Huebner's motion for summary judgment is denied and the Social Security Administration's determination that Huebner was not disabled prior to

December 31, 1983 is upheld.  It is so ordered.

ENTERED:

_____

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: September 30, 2009**